UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOANN POWELL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:10-cv-2644 |
| | § | |
| PROFILE DESIGN LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

On October 17, 2011, this Court issued a Memorandum and Order denying Plaintiff Joann Powell's ("Plaintiff" or "Powell") Motion to Dismiss Defendant Profile Design's ("Profile") First Amended Third Party Complaint Under 12(b)(2) for Lack of Personal Jurisdiction (Doc. No. 44), and granting Third-Party Defendant HL (USA) Corporation's ("HL (USA)") Motion to Dismiss Under Rule 12(b)(2) ("HL (USA)'s Motion to Dismiss") (Doc. No. 68). (Doc. No. 135.) Subsequently, Defendant Profile Design, LLC ("Defendant" or "Profile") filed Defendant's Motion for Reconsideration of Granting Third-Party Defendant, HL USA Corporation's Motion to Dismiss ("Motion for Reconsideration"). (Doc. No. 136.) Profile alleged that due to personal circumstances, Profile's attorney was unable to depose HL (USA)'s representative, Jon Chiang, and submit supplemental briefing to guide the Court's analysis in deciding HL (USA)'s Motion to Dismiss. (Mot. Recon. ¶¶ 5-7.) The Court granted the Motion for Reconsideration, withdrawing the portion of the Court's Memorandum and Order of October 17, 2011 granting HL (USA)'s Motion to Dismiss pending Profile's filing of supplemental briefing on the issue of this Court's jurisdiction over HL (USA). (Doc. No.

143.) The Court withdraws the portion of its Memorandum and Order granting HL (USA)'s Motion to Dismiss (Doc. No. 135), and issues this Memorandum and Order in its place. After considering HL (USA)'s Motion to Dismiss, all responses and replies thereto, the supplemental briefing, and the applicable law, the Court concludes that HL (USA)'s Motion to Dismiss must be **GRANTED.**

## I.    BACKGROUND

This is a products liability case arising from a bicycle accident. Powell claims that, while she was riding her bicycle during a training ride, the weld of the aerobar stem failed, causing her to be thrown forward over the front of the bicycle onto the pavement. She alleges that she sustained significant injuries as a result of the accident.  Powell subsequently filed this lawsuit against Profile for negligence, gross negligence, negligent failure to warn, strict liability for failure to warn, breach of express warranty, breach of implied warranty, and strict liability for manufacturing and design defects of the subject aerobar stem.  She contends that Profile was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling the subject aerobar stem.

Profile appeared in this lawsuit, filed an answer, and filed a Third-Party Complaint against Hsin Lung Accessories Co. Ltd., HL Corp., HL China Corp., Kalin Development Limited, HL Corp., HL Corp. Ltd., Hsin-Tech Co. Ltd., and HL (USA) (hereinafter collectively referred to as "Third-Party Defendants").  Profile's First Amended Third-Party Complaint alleges that the relevant bicycle stem was designed and manufactured by the Third-Party Defendants. (Doc. No. 42.)  Thus, Profile argues, it is entitled to contribution and indemnity from the Third-Party Defendants under Chapter 33

2

of the Texas Civil Practice and Remedies Code. HL (USA) now challenges the Court's jurisdiction, arguing that all claims against it should be dismissed, as it is "a California corporation that has no designated agent for service in Texas, no product distributor in Texas, no bank accounts, phone numbers, employees, offices or property in Texas, and is not and has never has [sic] been registered to do business in Texas." (Mot. Dismiss 1; Doc. No. 68-3, Chiang Decl. ¶¶ 4-7.)

## II.  LEGAL STANDARD

"Absent a rule or statute to the contrary, . . . a federal court [may] exercise jurisdiction over only those defendants who are subject to the jurisdiction of courts of the state in which the court sits." *Point Landing, Inc. v. Omni Capital International, Ltd.*, 795 F.2d 415, 419 (5th Cir. 1986), *aff'd sub nom. Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987). Because the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-17.045, is coterminous with the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Court's constitutional due process inquiry into personal jurisdiction also serves as an inquiry into personal jurisdiction under the Texas long-arm statute. *Command-Aire Corp. v. Ontario Mechanical Sales and Service Inc.*, 963 F.2d 90, 93-4 (5th Cir. 1992).

To comport with constitutional due process, a plaintiff must show that: (1) defendants purposefully availed themselves of the benefits and protections of Texas law, thereby establishing "minimum contacts" with Texas such that defendants could reasonably have anticipated being haled into court there; and (2) under the circumstances, the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* at 94 (citing *Asahi Metal Industry Co. v. Superior Court of*

3

*California*, 480 U.S. 102 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); and *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784 (5th Cir.1990)). *See also Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) ("When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident."). The minimum contacts requirement can be met through contacts sufficient to confer either specific or general jurisdiction. *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (citation omitted).

Specific jurisdiction exists "[w]hen a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (citation omitted). "The non-resident's purposefully directed activities in the forum must be such that he could reasonably anticipate being haled into court in the forum state." *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010) (citing *Burger King*, 471 U.S. at 474). *See also Choice Healthcare, Inc. v. Kaiser Foundation Health Plan of Colo.*, 615 F.3d 364, 369 (5th Cir. 2010) ("The 'purposeful availment' element ensures that a defendant will not be haled into court in a jurisdiction solely as a result of random, fortuitous, or attenuated contacts or the unilateral activity of another person or third party."). Further, specific jurisdiction "requires a sufficient nexus between the non-resident's contacts with the forum and the cause of action." *Clemens*, 615 F.3d at 378-79. Indeed, the non-resident defendant must purposefully avail herself of the privilege of conducting activities in the forum state. *Id.* at 379.

Both the plurality and the concurring opinions in the recent Supreme Court case *J. McIntyre Machinery, Ltd. v. Nicastro* shed light on the specific jurisdiction doctrine. In the plurality opinion, Justice Kennedy explained that a "defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." 131 S.Ct. 2780, 2788 (2011). The foreign manufacturer defendant in *J. McIntyre* sold its machines to a distributor who agreed to sell them in the United States, and several of those machines ended up in New Jersey, where they allegedly caused injuries. *Id.* at 2790. The defendant also attended trade shows in the United States displaying the machine, but not in New Jersey. The defendant had no office in New Jersey, did not pay taxes in New Jersey, did not own property in New Jersey, never sent employees to New Jersey, and never advertised in New Jersey. *Id.* The plurality decided, based on these facts, that the defendant did not "engage in any activities in New Jersey that reveal[ed] an intent to invoke or benefit from the protection of its laws." *Id.* at 2791. On this basis, it held, there was no personal jurisdiction over the defendant.

In a concurrence joined by Justice Alito, Justice Breyer wrote that the case could be decided on narrower grounds. He observed that "the relevant facts found by the New Jersey Supreme Court show no 'regular … flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else." *Id.* at 2792. Nor had the plaintiffs shown a "specific effort by the British Manufacturer to sell in New Jersey." *Id.* Indeed, plaintiff's counsel "has not otherwise shown that the British Manufacturer 'purposefully avail[ed] itself of

5

the privilege of conducting activities' within New Jersey, or that it delivered its good in the stream of commerce 'with the expectation that they will be purchased' by New Jersey users." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980)).

Unlike specific jurisdiction, general jurisdiction can be exercised when a defendant's contacts with the forum state are substantial, continuous, and systematic, though unrelated to the litigation. *Cent. Freight Lines, Inc.*, 322 F.3d at 381. The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). The Supreme Court illustrated the level of ties to the forum state required to establish general jurisdiction in *Helicopteros Nacionales de Colombia, S.A. v. Hall*. In that case, the Supreme Court determined that an out-of-state company's contacts with Texas were not sufficient to establish general jurisdiction, even though the company sent its chief executive officer to Houston for a contract negotiation, received checks drawn from a Houston bank, purchased equipment from a Texas enterprise, and sent personnel to Texas for training. 466 U.S. 408, 416 (1984). The Supreme Court held that "mere purchases [made in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." *Id.* at 418.

The Supreme Court further illustrated the operation of the general jurisdiction test in *Goodyear Dunlop Tires Operations, S.A. et al. v. Brown*, decided last year. In that case, the Supreme Court held that there was no general jurisdiction over a non-resident tire manufacturer that did not design, manufacture, or advertise its products in the forum

6

state, had no place of business, employees, registration, or bank accounts in the forum state, and did not solicit business or itself sell or ship tires to customers in the forum state. 131 S.Ct. 2846, 2852 (2011). The Court determined that holding the non-resident manufacturer liable under those circumstances would expand general jurisdiction so as to make "any substantial manufacturer or seller of goods … amenable to suit, on any claim for relief, wherever its products are distributed." *Id.* at 2857.

While the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists, a *prima facie* showing suffices, and the plaintiffs need not establish jurisdiction by a preponderance of the evidence. *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). Moreover, "the Court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction." *Id.* (citing *Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982)). "'The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery.'" *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985)).

### III. ANALYSIS

As a preliminary matter, Profile objects to the Declaration of Jon Chiang ("Chiang Declaration"), filed in support of HL (USA)'s Motion to Dismiss. (Doc. No. 151, Am'd Sur-Reply 1.) Specifically, Profile claims that the Chiang Declaration does not comply with 28 U.S.C. § 1746, as it was signed overseas but does not state, declare, verify, or certify under the penalty of perjury under the laws of the United States that the instrument is true and correct. (*Id.*) The Court rejects Profile's argument. The Chiang

7

Declaration is entitled: "Declaration of Jon Chiang Under Penalty of Perjury" and Chiang declares "under penalty of perjury that the foregoing is true and correct." The heading contains the style of the case, meaning that Chiang knew he was making his Declaration under the laws of the United States, as required by 28 U.S.C. § 1746. Indeed, while 28 U.S.C. § 1746 suggests the particular language "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct," the provision states only that the declaration need be "substantially" in that form. Given that the heading to the Chiang Declaration specified that the case would be based in the United States, the Court finds that the Chiang Declaration meets the requirements of 28 U.S.C. § 1746.

Next, Profile insists that "the information contained in the Declaration did not represent the true and correct averments of Mr. Chiang" because Chiang testified that he only reads simple English and the Declaration was not translated into Mandarin Chinese prior to his signature. (Am'd Sur-Reply 2.) The Court again disagrees. Chiang explained in his deposition that he communicates with clients in English and that he is able to read English. (Chiang Dep. 111:8-23.) Given this deposition testimony, the Court concludes that the Chiang Declaration represents the true and correct averments of Mr. Chiang.

Finally, Profile argues that several paragraphs in the declaration are legal conclusions, and thus are not properly the subject of an affidavit, sworn statement, or other testimony. (Am'd Sur-Reply 2.) The Court will not consider whether these statements, contained in paragraphs 16, 17, 18, 19, 20, 22, and 25 of the declaration, are in fact legal conclusions, as it does not rely upon them in this Memorandum and Order.

### A. Specific Jurisdiction

Profile states that HL (USA) attempts to avoid specific jurisdiction by denying that it sold the subject stem to Profile for distribution to other retailers. (*Id.* 8.) However, Profile avers, HL (USA) has not provided any evidence to support Chiang's conclusory statement that the subject stem was not sold and/or distributed by HL (USA). (*Id.* 8-9.) Indeed, Profile points out, HL (USA) has no documentation showing that HL (USA) distributed the subject stem because HL (USA) allegedly retains documents for only three years. (*Id.* 9.)

On the other hand, Profile explains, Profile has presented evidence, in the form of Mark Vandermolen's affidavit, that HL (USA) sold the subject stem made the basis of this lawsuit to Profile. (*Id.*) Specifically, Vandermolen, Director of Product for Profile, states: "Profile purchased the BOA stem which is the subject of this lawsuit from HL (USA). HL (USA) is an affiliate of HL China. HL (USA) acts as my window of communication and point of contact for most of my dealings with HL China. My personal contact with HL (USA) is Jon Chiang. Almost all communications between Profile and HL China are conducted through HL (USA), as HL China's representative. HL (USA) is the sole distributor of products designed and manufactured by HL China." (Doc. No. 74-1, Vandermolen Decl. ¶ 3.) Furthermore, "[t]he BOA stem which is the subject of this lawsuit carries the marking 'H' followed by a series of three numbers. The letter and three numbers refer to a date code applied to the subject stem by the manufacturer. The letter 'H' on the subject BOA stem stands for 'HL China.'" (*Id.* ¶ 4.) Profile also contends that it has various invoices demonstrating that the subject stem was sold to Profile by HL (USA). (Ex. C to Am'd Sur-Reply.) The Court will assume, for the purposes of this Memorandum and Order, that HL (USA) distributed the subject stem.

9

*Luv N' Care,* 438 F.3d at 469 ("This court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction.").

### I. *Profile's Allegations*

Profile distinguishes its claims from those in *J. McIntyre* by pointing out that HL (USA) "is not the foreign manufacturer of the defective product, but rather is the American distributing arm." (Am'd Sur-Reply 10.) As the distributor, Profile contends, "HL (USA) was aware that Profile intended to distribute the BOA stem to a national market." (*Id.*) Profile insists that, by attending trade shows, utilizing a product catalogue, and employing a sales force of four employees with a comprehensive marketing strategy, HL (USA) advertises and markets its products to a national audience. It does so, Profile explains, with the intention that these various products, like the subject stem, reach a market covering the entire United States. (*Id.*) Therefore, Profile concludes, "HL (USA) delivered the BOA stem into the stream of commerce with the expectation that it would be purchased by or used by consumers, such as Plaintiff, in Texas." (*Id.*) Indeed, Profile explains, "HL (USA) intends for its products to reach a national market, which includes Texas." (*Id.* 10-11.)

Furthermore, Profile contends, HL (USA) targets the Texas market through its large scale distributor, Quality Bicycle Products ("QBP"), which is based in Minnesota. (Am'd Sur-Sur-Reply 1.) Specifically, Profile avers: "HL (USA) distributes its products through QBP because of QBP's ability to reach the entire United States, including Texas, not because QBP is located in Minnesota and HL (USA) has a stated desire to store vast quantities of HL Zoom products in QBP's warehouse(s) in Minnesota. HL (USA) distributes its products through QBP because in QBP, HL (USA) has a partner with

10

market penetration in every state in the Untied States, including Texas." (*Id.* 3.) On these grounds, Profile argues that specific jurisdiction exists.

## II. HL (USA)'s Allegations

HL (USA) states that "there is no evidence produced to date that indicates a 'regular flow' or 'regular course of sales' between HL (USA) and Texas," as required under the specific jurisdiction test. (Resp. to Am'd Sur-Reply 7.) HL (USA) points out that the sale of the stem at issue took place, if at all, in California, not Texas. (*Id.*) Indeed, HL (USA) insists, "the uncontroverted evidence establishes that any and all interaction and involvement that HL (USA) ever had with the sale and distribution of the Profile BOA stem product line occurred, if at all, exclusively in California." (*Id.*) Furthermore, HL (USA) contends, it never sold or shipped products, including the Profile stem product line, to Texas, or did business with any customer in Texas. (*Id.*) HL (USA) argues that there is no evidence that it was foreseeable to HL (USA) that the stem in question would end up in Texas, or that HL (USA) conducted any action directed toward Texas. (*Id.* 8.) In fact, the stem in question ended up in a bicycle retail shop in Arizona after it left Profile, where it was mounted on a bicycle purchased by an Arizona resident as a gift for his mother, Powell; the bicycle was later shipped, mounted with the stem, to Powell's home in Houston, Texas. (*Id.* 8; Ex. D to Resp. to Am'd Sur-Reply, Answers to Interrogatories by JoAnn Powell.) HL (USA) further points out that it has never done business with any customer in Texas, never sold or shipped products to Texas, has never sent its employees to Texas for a business-related reason, never owned property in Texas, maintained agents, servants, or employees in Texas, or paid taxes of any form in the State of Texas. (*Id.* 9.)

11

### III. Analysis

In analyzing specific jurisdiction, the Fifth Circuit has stated that, "[w]here a defendant knowingly benefits from the availability of a particular state's market for its products, it is only fitting that the defendant be amenable to suit in that state." *Luv N' Care*, 438 F.3d at 470. The Fifth Circuit has therefore "declined to follow the suggestion of the plurality in *Asahi* … that some additional action on the part of the defendant, beyond foreseeability, is necessary to convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Id.* (internal citations, quotations, and footnote omitted). In other words, "[w]here a nonresident's contact with the forum state 'stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has [specific] jurisdiction if it finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state.'" *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 380 (5th Cir. 2002) (quoting *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987)). Therefore, under the Fifth Circuit's test, "[a] defendant need not have purposely directed its activities to the forum." *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 584 (5th Cir. 2010) (quotations and punctuation omitted). Importantly, "[t]he stream-of-commerce principle is applied to companies that … 'purposefully serve markets broader than the states in which [their] initial or direct sales are made.'" *Nuovo Pignone, SpA*, 310 F.3d at 381 (quoting *Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367, 1370 (5th Cir. 1987 (en banc))).

Applying its "more relaxed 'mere foreseeability' test," the Fifth Circuit concluded in *Luv 'N Care* that the defendant, Insta-Mix, had sufficient contacts with Louisiana to withstand constitutional scrutiny. *Id.* Insta-Mix manufactured bottles and sold them to Wal-Mart, which resold them at its retail locations. *Id.* at 468. Insta-Mix did not ship its product directly to Wal-Mart stores, however; instead, trucks or third-party carriers assigned by Wal-Mart transported the bottles from Insta-Mix's dock in Colorado Springs to one of Wal-Mart's distribution centers. *Id.* Wal-Mart assumed ownership of the bottles as soon as they were loaded in Colorado Springs. *Id.* Wal-Mart transported thousands of bottles to its distribution center in Louisiana. *Id.* The record included several invoices with a "send to" location of the Wal-Mart distribution center in Louisiana. *Id.* Although Insta-Mix had no employees or agent for service of process in Louisiana and conducted no direct sales or marketing there, the Court of Appeals determined that it was "eminently foreseeable that Insta-Mix's products would reach the market indicated on the company's invoices." *Id.* at 471. The Court found that there was specific jurisdiction even though Insta-Mix claimed its employees had no actual knowledge of the intended destination of the goods and even though title had passed to Wal-Mart. *Id.*

*J. McIntyre* clarified the contours of the specific jurisdiction analysis. In *J. McIntyre,* the Supreme Court of New Jersey below held that its courts could "exercise jurisdiction over a foreign manufacturer of a product so long as the manufacturer knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." *Nicastro v. McIntyre Machinery Am., Ltd.*, 201 N.J. 48, 76 (2010) (internal quotations omitted). The New Jersey Supreme Court determined, applying that test, that a British

13

manufacturer of scrap metal machines was subject to the jurisdiction of New Jersey, even though it had at no time advertised in, sent goods to, or otherwise targeted the State. In asserting jurisdiction over the British manufacturer, the Supreme Court of New Jersey relied on the following primary facts: (1) the American distributor on one occasion sold and shipped one machine to a New Jersey customer, (2) the British manufacturer permitted, indeed wanted, its independent American distributor to sell its machines to anyone in America willing to buy them, and (3) representatives of the British manufacturer attended trade shows in various American cities, although not in New Jersey. *J. McIntyre*, 131 S.Ct. at 2791 (citing *Nicastro*, 201 N.J. at 54-55).

The Supreme Court of the United States disagreed. In a concurrence joined by Justice Alito, Justice Breyer noted that "[t]he Court has held that a single sale to a customer who takes an accident-causing product to a different State (where the accident takes place) is not a sufficient basis for asserting jurisdiction." *Id.* at 2792 (citation omitted). Similarly, the Court "has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." *Id.* (citing *Asahi*, 480 U.S. at 111-12, 117, 122). Turning to the present case, the Justice Breyer opined:

> Here, the relevant facts found by the New Jersey Supreme Court show no "regular … flow" or "regular course" of sales in New Jersey; and there is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. [Plaintiff's attorney] … has shown no specific effort by the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting activities" within New Jersey, or that it delivered

14

> its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users.

*Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297-98). The Fifth Circuit has yet to interpret whether *J. McIntyre* modifies its stream-of-commerce analysis. One district court within the Fifth Circuit has determined that, "[a]s Justice Breyer declined to choose between the *Asahi* plurality opinions, *McIntyre* is rather limited in its applicability" and "does not provide the Court with grounds to depart from the Fifth Circuit precedents establishing Justice Brennan's *Asahi* opinion as the controlling analysis." *Ainsworth v. Cargotec USA, Inc.*, No. 2:10-CV-236-KS-MTP, 2011 WL 4443626, at *7 (S.D. Miss. Sept. 23, 2011). That court also noted that the factual scenario before it, in which it was undisputed that the defendant had sold over 200 forklifts to customers in Mississippi over the past decade, removed the case from the scope of *J. McIntyre*'s applicability. *Id.*

Other district courts within the Fifth Circuit have applied the *J. McIntyre* framework to guide their specific jurisdiction analyses. Recently, a district court in the Eastern District of Texas determined that it did not have specific jurisdiction over a Taiwanese manufacturer even though: (1) the manufacturer had a large customer base throughout the United States; (2) the manufacturer supplies to other major manufacturers, specifically LG and Samsung; (3) LG and Samsung sell consumer products throughout the United States and specifically within the Eastern District of Texas; (4) over 50% of the manufacturer's sales were dedicated to LG and Samsung; and (5) the manufacturer's products are available for purchase to customers across the county on multiple websites. *Bluestone Innovations, Tx., LLC v. Formosa Epitaxy, Inc.*, No. 2:10-cv-171-TJW-CE, 2011 WL 4591922, at *2 (E.D. Tex. Sept. 30, 2011). Drawing upon *J. McIntyre*, the court

determined that the plaintiff had failed to present any evidence that the manufacturer made a direct effort to sell its products to the Texas market, or even present evidence that its products were ever actually sold in the State of Texas. *Id.* at *3. In sum, the court concluded, "if the contacts with the forum state in *McIntyre* were insufficient to confer specific personal jurisdiction, then ForEpi's contacts with Texas are likewise insufficient." *Id.* The court also declined to find specific jurisdiction with regard to a second manufacturer because the Supreme Court had concluded "that a single isolated sale, even when accompanied by the fact that defendant employed an American distributor who was permitted to sell the defendant's products to anyone willing to buy them, was not sufficient to support jurisdiction." *Id.* at *6. In the present case, "apart from [the manufacturer's] single isolated sale in Texas, [plaintiff] has presented no evidence indicating that [the manufacturer] made any special efforts to sell its products in Texas." *Id.*

That same district court determined that it did have specific jurisdiction under a stream-of-commerce theory in another case, however, based on the fact that (1) defendant entered into an agreement with plaintiffs, granting defendant an exclusive right to manufacture, import, offer to sell, and sell the products at issue globally; (2) defendant "agreed that it would use its best efforts to manufacture and vigorously promote the marketing and sale of the [products at issue] and [defendant] admit[ed] that its advertising [of the products at issue] to consumers via the Internet and its catalogs were intended to reach a market coving [sic] the entire United States"; and (3) defendant convinced the national distributor, Wal-Mart, to sell the product. *Brooks & Baker v. Flambeau, Inc.*, No. 2:10-cv-146-TJW-CE, 2011 WL 4591905, at *3 (E.D. Tex. Sept. 30,

16

2011). The court concluded that the case was distinguishable from the controlling opinion in *J. McIntyre* because "[defendant] admitted that it inserted the accused products into the stream of commerce with the intention that the products reach a national market—that is, [defendant] intended Texas consumers to purchase the products at issue in this lawsuit. Furthermore, the evidence shows that [defendant] made many more than just one isolated sale in Texas." *Id.* at *4.

Profile is quite right that this case involves the United States arm of a foreign company, HL (USA), rather than the foreign manufacturer itself, HL China. HL (USA) sells its products to QBP, which in turn distributes HL's name brand throughout the United States. (Chiang Dep. 19:11-25, 35:4-14.) When HL (USA) does business with QBP, it is with the expectation that QBP may distribute its products throughout the United States. (*Id.* 21:8-12.) HL (USA) makes decisions about which customers to sell to based on whether they are able to distribute HL's product in as many markets as possible. (*Id.* 27:16-22.) HL (USA) also has customers with respect to private-marked stems. (*Id.* 91:14-17.) In addition, HL (USA) attends trade shows in the United States. (*Id.* 16:1-17.) Although HL (USA) does not have any customers in Texas, there is no prohibition against distribution of its products in Texas, and HL (USA) desires for its products to be distributed throughout the United States. (*Id.* 23:9-24:5.) HL (USA) also has employees who are dedicated to marketing or sales. (*Id.* 40:14-20.)

In *J. McIntyre*, it was not enough that the British manufacturer permitted, and even wanted, its American distributor to sell its machines to anyone in America willing to buy them. Therefore, the Court does not believe that HL (USA)'s merely delivering its goods to a distributor, and desiring for products to be distributed throughout the United

17

States, without more, confers specific jurisdiction. Even though HL (USA) has employees dedicated to marketing and sales, and even though, as in *J. McIntyre*, HL (USA)'s representatives sometimes attend trade shows, there is no evidence of "something more," such as "special state-related design, advertising, advice, marketing, or anything else" to show that HL (USA) specifically availed itself of the privilege of conducting activities in Texas. Nor is there evidence, such as the invoices in *Luv 'N Care*, to show it would have been foreseeable to HL (USA) that its products would have ended up in Texas. Simply, Profile has not met is burden of showing that HL (USA) is "aware that the final product is being marketed in the forum State." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring). In other words, there is no evidence that HL (USA) delivers its goods into the stream of commerce with the expectation that they will be purchased by Texas users. Nor is there is evidence of a regular flow or regular course of sales in Texas; indeed, there is no evidence that any HL (USA) products have even made their way into Texas through the stream of commerce. "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id*. The only HL (USA) product known to have been in Texas—the product which caused the injury—was in fact sold at a retail shop in Arizona. Given the above, the Court concludes that it has no specific jurisdiction over HL (USA).

### B. General Jurisdiction

Profile asserts that this Court has general jurisdiction over HL (USA) because: HL (China) is one of the largest manufacturers of bicycle component parts in the world; HL (China) sells hundreds of different models of stems for bicycles, including the BOA stem

made the basis of this lawsuit; HL (China) offers a wide variety of stems in different lengths, rises, and other configurations; HL (China) offers the different stems to distributors throughout the United States through a product catalogue and trade shows; if a distributor wants to purchase any product manufactured by HL (China), the order is placed through HL (USA); and HL (China) manufactures bicycle component parts, such as stems, for its own benefit under the brand name "ZOOM," which is only distributed through HL (USA). (Am'd Sur-Reply 11.) According to Profile, by choosing a national distributor, such as QBP, to distribute its products across the United States, HL (USA) intends to have its products sold in Texas. (*Id.* 12.) Indeed, Profile contends, QBP provides clients such as HL (USA) with reports showing the state-by-state distribution of their product for marketing and other sales analyses. (*Id.*) Therefore, Profile concludes, "HL (USA) has continuing and systematic contacts with this forum through the sale and distribution of its own branded stems (the 'ZOOM' stem products) which allow for the exercise of personal jurisdiction." (*Id.*)

The Court believes that these arguments are unavailing. "General jurisdiction may be found when the defendant's contacts with the forum state are substantial, continuous, and systematic." *Jackson*, 615 F.3d at 584 (citing *Helicopteros Nacionales*, 466 U.S. at 414-19). "The 'continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum.'" *Id.* (quoting *Johnson*, 523 F.3d at 609). "To confer general jurisdiction, a defendant must have a business presence *in* the forum state." *Id.* (citing *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999)). In *Goodyear Dunlop Tires Operations, S.A. et al. v. Brown*, the Supreme Court held that there was no general jurisdiction over a non-resident

19

tire manufacturer that did not design, manufacture, or advertise its products in the forum state, had no place of business, employees, registration, or bank accounts in the forum state, and did not solicit business or itself sell or ship tires to customers in the forum state. 131 S. Ct. at 2852. The Court determined that holding the non-resident manufacturer liable under those circumstances would expand general jurisdiction so as to make "any substantial manufacturer or seller of goods … amenable to suit, on any claim for relief, wherever its products are distributed." *Id.* at 2857. Indeed, the Fifth Circuit has emphasized that "[i]njecting a product, even in substantial volume, into a forum's 'stream of commerce,' without more, does not support general jurisdiction." *Jackson*, 615 F.3d at 584 (quoting *Bearry*, 818 F.2d at 375). Injecting HL (USA) products into the stream of commerce, then, is not enough to confer general jurisdiction, and Profile has failed to otherwise demonstrate that HL (USA) has substantial, continuous, and systematic contacts with Texas. Therefore, the Court cannot exercise general jurisdiction over HL (USA).

### IV.   CONCLUSION

For the reasons explained above, the Court finds that it does not have personal jurisdiction over HL (USA). Therefore, HL (USA)'s Motion to Dismiss is **GRANTED.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 17th day of January, 2012.

_____
**KEITH P. ELLISON**
**UNITED STATES DISTRICT COURT JUDGE**

20